

# NUMBER 13-06-334-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

CHARLES MATTHEWS,                                                 **Appellant,**

**v.**

ROBERT SCOTT, STATE COMMISSIONER
OF EDUCATION AND DALLAS
INDEPENDENT SCHOOL DISTRICT,                          **Appellees.**

---

On appeal from the 53rd District Court of Travis County, Texas.

---

# O P I N I O N

**Before Chief Justice Valdez and Justices Garza and Benavides
Opinion by Justice Benavides**

Appellant, Charles Matthews, appeals the trial court's order denying his appeal of

a decision by the Texas Commissioner of Education (the "Commissioner").[1]  *See* TEX.

---

[1] Throughout the course of the proceedings below, Shirley Neeley was the Texas Commissioner of Education.  During this appeal, Robert Scott assumed the position of Commissioner.  Accordingly, we substituted Scott, the current Texas Commissioner of Education, as an appellee in this appeal.  TEX. R. APP. P. 7.2(a).

EDUC. CODE ANN. § 21.307 (Vernon 2006). The Commissioner upheld the termination of Matthews's employment as superintendent of the now-defunct Wilmer-Hutchins Independent School District ("WHISD") by a management team appointed by the Commissioner. *See id.* §§ 21.301, 21.303 (Vernon 2006). The trial court then denied Matthews's appeal from the Commissioner's decision. *See id.* § 21.307. On appeal, Matthews argues that (1) no action was taken to terminate his contract by either the WHISD board of trustees or the management team appointed by the Commissioner, and (2) the Commissioner's decision was not supported by substantial evidence. *See id.* § 21.307(e)-(g). We affirm.

## I. Background

Matthews was hired as the superintendent of WHISD under a five-year employment contract signed on August 30, 2004. The contract provided that the WHISD board of trustees could dismiss him at any time for good cause in accordance with the Texas Education Code and the board's policy. *See id.* §§ 21.211, 21.212(d), 21.156(a) (Vernon 2006). WHISD began suffering financial difficulties, and on November 12, 2004, the Commissioner appointed a "management team" to "direct the operations of the district in areas of unacceptable performance." *See id.* §§ 39.131(a)(8) (Vernon Supp. 2007); *see also id.* § 39.135 (Vernon 2006). The Commissioner appointed Albert C. Black, Jr. and Michelle Willhelm to serve as the management team.

On November 27, 2004, the WHISD board of trustees sent notice to Matthews that it would consider a proposal to terminate his term contract.[2] Matthews requested a

---

[2] Matthews was also notified that the board of trustees was considering suspending him without pay. A certified hearing examiner later determined that this course of action was not allowed under Matthews's contract with the district. This proposed action is not the subject of this appeal, and we will not discuss the facts adduced below relating to this proposal.

2

hearing before a certified hearing examiner, *see id.* § 21.253(a) (Vernon 2006), and the Commissioner appointed Fred Ahrens, an independent certified hearing examiner, to preside. *See id.* § 21.254 (Vernon 2006).

A hearing was held on February 16, 2005. *See id.* § 21.256 (Vernon 2006). At the hearing, Matthews appeared through counsel. WHISD presented testimony from two witnesses. First, William Goodman testified that he had been hired by WHISD in September 2004 to act as the interim business officer to help the district resolve its financial problems. Goodman explained that the superintendent of a school is responsible for setting and managing the school district's budget.[3] Goodman opined that when a school district ends up with a negative fund balance, the superintendent is ultimately responsible.

Goodman stated that the budget for the 2003-2004 year overestimated revenue by $4 million. He testified that the district budgeted expenditures of $21 million, but it received revenues of only $14 million. The district was able to reduce expenditures to approximately $18 million. Thus, the district was operating at a $4 million deficit for the 2003-2004 school year.

Goodman explained that due to this deficit, the district was forced to borrow nearly $4 million under a one-year note. The note for that loan was due and payable in March 2005. He noted that there were no changes in the law that year that would provide more revenues to the school district. Therefore, the district should have estimated revenues for

---

[3] Counsel for WHISD referred Goodman to Texas Education Code section 44.002, which provides, "On or before a date set by the State Board of Education, the superintendent shall prepare, or cause to be prepared, a proposed budget covering all estimated revenue and proposed expenditures of the district for the following fiscal year." TEX. EDUC. CODE ANN. § 44.002 (Vernon 2006).

3

the 2004-2005 school year at approximately the same amount as were received in 2003-2004, or $14 million. Because of the payment due on the $4 million loan, the budget for the 2004-2005 year should have anticipated only $10 million available for expenditures. Nevertheless, the district's budget for the 2004-2005 school year budgeted $ 21.7 million in revenue and planned expenditures of approximately the same amount. Goodman testified that these estimates were unrealistic given that there were no changes in the law that could have provided additional state or local revenue. Goodman testified that WHISD had access to information that could have provided accurate projections of the school district's revenues.

Goodman testified that when a school district faces a budget deficit, the prudent course of action is to reduce expenditures on personnel, which is typically a school district's biggest expense. He testified that in the spring of 2004, Matthews and the board of trustees discussed reducing expenditures; nevertheless, additional personnel were hired. He also testified that the school district had budgeted for two new schools to be opened, including an expensive performing arts school. He testified that this was not a prudent course of action given the budget deficit. Goodman stated that the district had anticipated that a bond initiative scheduled for September 2004 would be adopted by the voters in the district, providing additional revenue. Goodman stated, however, that it was not prudent to budget the district expenses based on the unknown will of the voters in the district.

Finally, Goodman noted that the district had projected an enrollment increase of 150 students. The enrollment for the year 2004-2005 actually dropped by 200 students. Thus, WHISD had overestimated its employment needs for the year, resulting in increased expenditures that were unnecessary. Additionally, Goodman testified that WHISD's

4

auditors projected an increase in revenues from the construction of approximately 500 new homes.

According to Goodman, as a result of the budget problems, WHISD was unable to pay its employees in August 2004 because of a budget deficit. He stated that the same problem occurred in November 2004. He further opined that the same problem would occur again in March 2005 unless drastic measures were taken.

On cross-examination, Goodman was questioned about Matthews's efforts to remediate the problems with WHISD's finances. Goodman stated that he met with Matthews in October 2004 to discuss how to reduce expenditures during the 2004-2005 school year. Matthews and Goodman agreed to declare a financial exigency and then to implement a reduction in force to reduce expenditures. Matthews then recommended a reduction in force at an October 11, 2004 meeting of the WHISD board of trustees. The board of trustees instructed Matthews to create a list of employment positions that could be eliminated; Matthews complied. As a result, WHISD was able to eliminate over eighty positions. Had these terminations occurred at the beginning of the school year, the resulting savings would have been approximately $2.8 million. However, Goodman testified that because the reduction in force did not occur until after the school year began, the potential savings were reduced due to attorney's fees, court reporter expenses, and other expenses associated with terminating teachers' contracts in mid-term.

Additionally, Goodman testified that Matthews recommended that the board of trustees impose a moratorium on non-essential and non-personnel spending. Matthews also recommended borrowing money to cover the one-year note for $4 million that would become due in March 2005. Goodman testified that these first steps were a good start to

remedying the financial situation, but he opined that these steps should have been taken five to six months earlier. In sum, Goodman testified that Matthews did not meet his obligations under the Texas Education Code to operate the district in a sound financial manner.

Second, James Damm, the appointed interim superintendent, testified that WHISD was entangled in a "very serious financial crisis." He testified that the school district first suffered a negative fund balance during the 2002-2003 school year. WHISD's negative fund balance became worse during the 2003-2004 school year. He opined that when a negative fund balance occurs, the district should immediately declare a financial exigency and adopt cost reduction measures to remedy the situation, because carrying a negative fund balance violates the Texas Education Code. He testified that WHISD should have addressed the negative fund balance during the 2003-2004 school year, and it is the superintendent's responsibility to call the problems to the board of trustees' attention. Damm stated that Matthews did not timely notify the board of trustees of a shortfall in revenues for the 2003-2004 school year.

Damm testified that the superintendent is responsible for preparing the budget for the district. He testified that the 2004-2005 budget contained unrealistic revenue projections. According to Damm, WHISD had overstated projected revenues by $3 million for the 2004-2005 school year. Damm opined that the superintendent was responsible for reporting accurate information to the board of trustees regarding the projected revenues.

Damm testified about the source of the understated revenues for the district. He stated that after tax appraisals are sent to residents in April, there is an appeals process that takes place during the summer months. These appeals generally result in a six to

6

seven percent reduction in appraised values from what the preliminary tax rolls estimate as the revenues from local taxes. He testified that the preliminary tax roll estimates were used to create the district's budget without accounting for the adjustments that would be made during the appeals process. He said that the superintendent should have accounted for this reduction. Damm stated that the calculation of local tax revenues affects the calculation of the state revenues that the district would receive. The state revenues were overstated as a result of the miscalculation.

Damm also testified that the district is compensated by the state based on an average daily attendance of students, which is estimated at the beginning of the year. He testified that enrollment in the district had declined, while at the same time, the district's employment had increased. Damm testified that the personnel increase was a major contributor to the district's financial problems, and he opined that the superintendent is responsible for the allocation of staff.

Damm testified that Matthews had not operated the district in a fiscally sound manner. He stated that Matthews did not timely inform the board of trustees of the shortfall in the district's revenue for the 2004-2005 school year, because no disclosure was made until after Damm was hired in September 2004 and performed an analysis of the district's finances.

On cross-examination, Damm was also questioned about the steps undertaken to remedy the district's financial problems. Damm described the reduction in force Goodman discussed, and he stated that three schools had been closed to reduce expenditures. He testified that, under the plan adopted, WHISD was on track to remedy the situation in approximately three years.

Matthews then testified in his own behalf. He testified that his reviews by the board of trustees had been exemplary. His main explanation for the budget shortfall in 2003-2004 and again in 2004-2005 was that the district had to prepare for the student enrollment increase that they anticipated. Matthews testified that his goal for the district was to bring more students into the district, which would bring in additional state funding. This, he explained, was the reason for the large expenditures on personnel and opening new schools in the district even though the district was suffering financial problems.

Matthews admitted that the budget was his responsibility, but he essentially blamed his budget expert and the rest of his management team for the budgetary problems. He explained that the budget was a "group decision," but he stated that his budget expert, a "Dr. Roberson,"[4] was ultimately responsible for estimating the potential revenues for the next year. Matthews admitted, however, that when Roberson presented his projections, Matthews questioned him extensively and was satisfied with his research. On cross-examination, Matthews admitted that Roberson's estimates had been inaccurate for the 2003-2004 school year, but nevertheless, Matthews had recommended him for re-employment during the 2004-2005 school year.

Matthews explained that once he reviewed the financials with Damm in September 2004, he realized the problems that the school district was having and immediately took action. He testified that he proposed a staff reduction to the board of trustees, but he was suspended from his position before he could implement the rest of his plan to remedy the district's financial situation. He stated that there was no reason that he would be unable

---

[4] Roberson's first name is not provided in the record.

to alleviate the district's financial problems if given the chance.

On March 2, 2005, the certified hearing examiner issued his recommendation. The examiner made the following relevant fact findings: (1) "WHISD did not have enough money to cover employee paychecks in August 2004"; (2) "WHISD did not have enough money to cover the November 2004 payroll on the normal payroll date"; (3) "In the Fiscal Year 2004-2005 WHISD budgeted $21.7 million in revenue and expenditures. In fiscal year 2003-2004 the actual revenues were $14.1 million and expenditures were $18.4. The revenue increase for the 2004-2005 school year was unrealistic"; (4) "Matthews did not inform the Board in a timely fashion of the shortfall in revenue in relation to the 2004-2005 budget"; and (5) "Matthews failed to competently perform the duties as Superintendent [a]s set forth in the Texas Education Code and/or WHISD Policies."

The hearing examiner found that WHISD established good cause to terminate Matthews. First, the hearing examiner found that the 2004-2005 budget overstated projected revenue by at least $3 million. He found that "[t]his shortfall in revenue was due in part to an inflated evaluation of property taxes because of the failure to factor in the result of property-appraisal appeals and the unrealistic assumption of an increase in the student population of 250 students over the 2003-2004 number of students." The shortfall was attributed to Matthews because he presented the budget to the board of trustees and recommended its adoption. Second, the examiner found that Matthews did not advise the board of trustees of these problems with the budget. He found that "[i]t was Matthews'[s] responsibility as superintendent to keep the Board informed of the financial situation of the District and to formulate corrective actions for approval and implementation." Third, the examiner found that "Matthews'[s] financial mismanagement of the District has caused the

9

District to declare a financial exigency and has placed it in a fiscal crisis." Finally, the examiner found that Matthews failed to competently perform his financial responsibilities. Accordingly, the examiner found good cause to terminate Matthews's contract and recommended that the board of trustees take such action.

On March 7, 2005, the WHISD board of trustees held an open hearing to consider the hearing examiner's recommendation that the board terminate Matthews's employment contract. *See id.* § 21.2158 (Vernon 2006). The management team, Willhelm and Black, were present at the board meeting. The board of trustees took notice of the hearing examiner's recommendation and the reporter's record of the hearing. Matthews's counsel and WHISD's counsel were then allowed to present argument. *See id.* § 21.2158(c).

After both sides presented arguments, the board of trustees deliberated in a closed session. Upon their return, a board member moved that the board of trustees not accept the hearing examiner's recommendation. That motion was seconded. The motion carried by a three-to-one vote. The management team then interjected, and the following exchange occurred:

| | |
|---|---|
| Mr. Black: | —with the authority that the Texas Education Agency has put on the management team, let us note—note that we intend to, and we are, overriding that particular decision. |
| Mr. Edwards: | Okay. Let the record reflect that the TEA management team is overriding the decision that's just been made by the Board of Trustees of the Wilmer-Hutchins Independent School District. On 10.5— |
| Mr. Black: | Mr. President, will you seek the advice of counsel before you proceed with your agenda so we can make sure that matter's in order? |
| Mr. Edwards: | Okay. |

10

Mr. Moye: I think—Mr. O'Hanlon, correct me if I'm wrong. I think that now you are—having had the direction from the TEA management team, I think, procedurally, the proper thing to do would be for you to vote again and to accept the recommendation of the—of the independent hearing examiner.

Ms. Brewer: Mr. President—

Mr. Edwards: Ms. Brewer?

Ms. Brewer: —I move that on the agenda item 10.4.1 that we accept the independent hearing examiner's recommendation of terminating Dr. Charles Matthews.

Mr. Edwards: At the discretion of the TEA management team?

Mr. Moye: At the direction.

Mr. Edwards: At the direction.

Ms. Brewer: At the direction of the TEA management team.

Mr. Edwards: It's been moved by Ms. Brewer on 10.4 on the case of Dr. Charles Matthews, at the direction of the TEA management team, approve the hearing—independent hearing examiner report. Roll call vote.

. . . .

Mr. Edwards: Motion failed, 3—

Mr. Black: Again, Mr. President, we're going to override that particular vote also and not require a vote at this time but in—move to affirmative action.

After this discussion, Black addressed the board of trustees and asked them to vote again and to accept the hearing examiner's recommendation. Another motion was made to adopt the hearing examiner's recommendation, findings of fact, and conclusions of law. One board member objected to having the TEA management team direct its actions and

11

alleged that the team was forcing the board's hand. The WHISD attorney then advised the board of trustees that the management team had the authority to direct the board's action under section 39.135 of the education code. The board of trustees' general counsel advised that the board uphold the hearing examiner's decision. The president of the board of trustees then noted that a motion was on the floor to adopt the hearing examiner's decision, and he asked for a second. When none was made, the motion died, and the meeting was adjourned.

Subsequently, Matthews was advised that he had been removed from the district's payroll, although the record is not entirely clear how this occurred. Matthews appealed his termination to the Commissioner. *See id.* § 21.301. On May 16, 2005, the Commissioner issued a decision denying Matthews's appeal.[5] The Commissioner interpreted the provisions in the Texas Education Code relating to the appointment and authority of a management team, holding that section 39.135(c) "establishes the authority of the management team to take action." Specifically, the Commissioner held that "[a] management team may direct an action to be taken by the principal of a campus, the superintendent of the district, or the board of trustees of the district and may approve or disapprove any action of the principal of a campus, the superintendent, or the board of trustees of the district." In the conclusions of law, the Commissioner further concluded as a matter of law that the "management team accepted the recommendation of the certified hearing examiner to terminate [Matthews's] employment by disapproving the action of the

---

[5] Shirley Neeley, the Commissioner of Education at the time of the administrative appeal, designated Chief Deputy Commissioner Robert Scott to render a decision on her behalf. The parties do not dispute her authority to have made such an appointment. As noted, Scott is now the Commissioner of Education. For ease of reference, we will refer to this decision as that of the Commissioner.

12

board of trustees to reject the recommendation."

The Commissioner held that there is "no specific process by which a management team takes action to direct a board of trustees or disapprove a board vote." The Commissioner noted that it is "problematic" when a board of trustees refuses or fails to take action required by the management team. Because the management team cannot "require board members to vote in a manner contrary to the members' beliefs," the Commissioner held that the "management team has the authority under Texas Education Code section 39.135(c) to effectuate its determination that a particular action be taken." For this proposition, the Commissioner cited Texas Government Code section 311.021, the Code Construction Act. *See* TEX. GOV'T CODE ANN. § 311.021 (Vernon 2005).

The Commissioner then reviewed the record and determined that the management team took action twice regarding the hearing examiner's recommendation. The Commissioner found that the board of trustees initially voted not to accept the recommendation of the certified hearing examiner, but determined that the management team "pursuant to its authority under Texas Education Code section 39.135(c), disapproved the vote of Respondent board of trustees by overriding the vote and, in doing so, acted to approve or accept the recommendation of the certified hearing examiner to terminate [Matthews's employment]." Specifically, the Commissioner pointed to Black's statement that "[w]ith the authority that the Texas Education Agency has put on the management team, let us note—note that we intend to, *and we are, overriding that particular decision.*" Moreover, the Commissioner pointed to the board president's announcement, "let the record reflect that the TEA management team is overriding the decision that's just been made by the Board of Trustees of the Wilmer-Hutchins

13

Independent School District." The Commissioner held that "[w]hile the management team did not state specifically that it accepted or adopted the recommendation of the certified hearing examiner, the act of overriding or disapproving the board's vote in a situation where only one of two things can happen, either adopt or reject the recommendation, left only one result remaining." Thus, the recommendation of the certified hearing examiner was adopted.

With respect to the board of trustees' second vote, the Commissioner determined that "[t]he management team, pursuant to its authority under Texas Education Code section 39.135(c), overrode or disapproved the second vote to accept the recommendation of the certified hearing examiner to terminate [Matthews's] employment by moving the matter to affirmative action and in doing so, acted to approve or accept the recommendation of the certified hearing examiner to terminate [Matthews's employment]." The Commissioner pointed to the management team's statements after the second vote failed: "Again, Mr. President, we're going to override that particular vote also and not to require a vote at this time but in—*move to affirmative action.*" The Commissioner concluded that, as a result of this statement, the management team disapproved or overturned the board's vote against adopting the hearing examiner's recommendation, and this resulted in adoption of the recommendation to terminate Matthews's employment.

Finally, the Commissioner held that even if the procedure was flawed, any error did not lead to an erroneous decision by the board of trustees because the recommendation of the certified hearing examiner was supported by substantial evidence and was not arbitrary, capricious, or unlawful. *See* TEX. EDUC. CODE ANN. § 21.303 (Vernon 2006) ("The commissioner may not reverse a decision of a board of trustees based on a procedural

14

irregularity or error by a hearing examiner, the board of trustees, or a board subcommittee unless the commissioner determines that the irregularity or error was likely to have led to an erroneous decision by the board or board subcommittee."). The Commissioner held that the certified hearing examiner's findings were supported in the record, and Matthews failed to identify any finding of fact that was not supported by substantial evidence. Although Matthews argued that he was attempting to remedy the school district's financial problems at the time of his termination, the Commissioner found that he was not entitled to remediation. According to the Commissioner, because Matthews played a large role in creating the district's financial problems, there was good cause to terminate his employment.

On May 22, 2005, Matthews timely filed a motion for rehearing with the Commissioner. *See id.* § 21.3041(a) (Vernon 2006). That motion was overruled by operation of law 45 days later. *See id.* § 21.3041(c). On July 22, 2005, Matthews timely filed a petition in the Travis County District Court seeking to appeal the Commissioner's decision. *Id.* § 21.307(a). He named the Commissioner of Education and WHISD as defendants.[6] On April 19, 2006, the parties appeared for a hearing at which Matthews offered the record from the administrative appeal into evidence. On April 27, 2006, the trial court issued an order affirming the Commissioner's decision. This appeal ensued.[7]

## II. Standard of Review

---

[6] After the suit was filed, WHISD was annexed into the Dallas Independent School District. *See* TEX. EDUC. CODE ANN. § 39.131(a)(10)(A) (Vernon 2006) (authorizing annexation). We subsequently granted Dallas Independent School District's motion to substitute itself as the appellee in this case.

[7] The case was transferred to this Court pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (Vernon 2005).

15

The decision we are asked to review is that of the Commissioner of Education. *See* TEX. EDUC. CODE ANN. § 21.307(a). "A court can reverse the commissioner's decision on a teacher's contract if the decision is not supported by substantial evidence or if the commissioner's conclusions of law are erroneous." *Montgomery Indep. Sch. Dist. v. Davis,* 34 S.W.3d 559, 562 (Tex. 2000).

Matthews had the burden in the trial court to demonstrate that the Commissioner's decision was not supported by substantial evidence. *Miller v. Houston Indep. Sch. Dist.,* 51 S.W.3d 676, 680 (Tex. App.–Houston [1st Dist.] 2001, pet. denied) (citing *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1984); *Farris v. Fort Bend Indep. Sch. Dist.,* 27 S.W.3d 307, 311 (Tex. App.–Houston [1st Dist.] 2000, no pet.)). "Substantial evidence means more than a mere scintilla; thus, the evidence may preponderate against the agency's decision, yet still amount to substantial evidence." *Id.* (citing *Mireles v. Tex. Dep't of Pub. Safety*, 9 S.W.3d 128, 131 (Tex. 1999)). To uphold the Commissioner's decision, we must merely find that reasonable minds could have reached the same conclusion as the Commissioner. *Id.* (citing *Tex. State Bd. of Dental Exam'rs v. Sizemore*, 759 S.W.2d 114, 116 (Tex. 1988); *Farris*, 27 S.W.3d at 311). "The Commissioner's reasoning for his decision is immaterial if his conclusion is correct." *Id.* (citing *Tex. Employment Comm'n v. Hays*, 360 S.W.2d 525, 527 (Tex. 1962)).

When the Commissioner, in his conclusions of law, is called upon to construe a statute for which the Texas Education Agency is charged with enforcement, we must give serious consideration to that construction, "so long as the construction is reasonable and does not contradict the plain language of the statute." *Id.* at 680-81 (citing *Dodd v. Meno*,

16

870 S.W.2d 4, 7 (Tex. 1994)). Although the Texas Education Code's employment provisions are remedial and should be construed broadly, "we are not inclined to reverse the Commissioner's reasonable determination in an area where he [or she] possesses considerable authority and expertise." *Id.* (quoting *Dodd*, 870 S.W.2d at 7).

### III. Discussion

By two issues, Matthews argues that the trial court erred in affirming the Commissioner's decision to uphold Matthews's termination.

### A. Action by Management Team

By his first issue, Matthews argues that no action was taken either by the board of trustees or the management team to terminate his contract. Matthews argues that the management team's only action was to disapprove of the board of trustees' decision not to adopt the hearing examiner's findings and recommendation; it did not direct any action to be taken by the board. Thus, no action was taken by anyone to terminate Matthews's contract. Because the board of trustees is required to "announce a decision" with respect to the hearing examiner's recommendation within the time period set forth in Texas Education Code section 21.259, and never did so, he argues that he remains the superintendent of WHISD and is entitled to reinstatement and back pay. *See* TEX. EDUC. CODE ANN. § 21.259 (Vernon 2006). We disagree.

The Commissioner of Education may impose sanctions on districts when the district does not satisfy areas of accreditation criteria under education code section 39.071, the academic performance standards under section 39.072 of the code, or any financial accountability standard as determined by commissioner rule. *See id.* §§ 39.071,

17

39.072(a), 39.131 (Vernon Supp. 2007). "At the upper end of the available sanctions, the Commissioner may "appoint a management team to *direct the operations of the district in areas* of unacceptable performance." *Robinson v. Neeley,* 192 S.W.3d 904, 907-08 (Tex. App.–Dallas 2006, pet. denied) (emphasis added) (citing TEX. EDUC. CODE ANN. § 39.131(a)(8)).

Texas Education Code section 39.135(c) sets forth the powers that may be exercised by a management team appointed by the Commissioner:

> (c)    A conservator or management team, if directed by the commissioner, shall prepare a plan for the implementation of action under Section 39.131(a)(9) or (10). The conservator or management team:
>
>     (1)    *may direct an action* to be taken by the principal of a campus, the superintendent of the district, or the board of trustees of the district;
>     (2)    *may approve or disapprove any action* of the principal of a campus, the superintendent of the district, or the board of trustees of the district; . . . .

TEX. EDUC. CODE ANN. § 39.135(c) (emphasis added). The Commissioner held that this section does not provide for any specific procedure or process by which a management team may take action. We agree.

The statute's plain language does not provide for or require any specific procedure—so long as the management team makes its will known and acts within its statutory discretion to direct, approve, or disapprove an action by the board of trustees, that is enough under the statute. We will not read words into the statute to require a particular procedure when the legislature has not seen fit to do so itself. *City of Rockwall v. Hughes*, 246 S.W.2d 621, 631 (Tex. 2008) ("[C]hanging the meaning of the statute by adding words to it, we believe, is a legislative function, not a judicial function."). Accordingly, we defer

18

to the Commissioner's interpretation of the statute, and his legal conclusion that the statute does not require any specific procedure is not erroneous.

That does not end our inquiry. We must determine what happens when a management team disapproves action or directs action by the board of trustees, but the trustees refuse to acknowledge such action. Matthews argues that in this situation, the effect is as if no action were taken by any party; therefore, he was not terminated and is entitled to back pay and reinstatement. The Commissioner noted this problem but found that because the management team cannot "require board members to vote in a manner contrary to the members' beliefs," the "management team has the authority under Texas Education Code section 39.135(c) to effectuate its determination that a particular action be taken." TEX. EDUC. CODE ANN. § 39.135(c). The Commissioner found that any other construction would render meaningless the provision for appointing a management team to direct actions. *See* TEX. GOV'T CODE ANN. § 311.021. We agree with the Commissioner's interpretation.

The clear import of the education code's management team provision is to allow the Commissioner to remedy problems in districts that have fallen short of performance measures in limited areas where the consequences to the district—and the students attending school there—could be disastrous. *See* TEX. EDUC. CODE ANN. §§ 39.071, 39.072(a), 39.131(a)(8). It would make no sense to allow the Commissioner to appoint a management team to remedy a district's problems, only to have that team be disregarded by the board of trustees. Such a construction would render education code sections 39.131 and 39.135 meaningless. *See id.* §§ 39.131, 39.135; TEX. GOV'T CODE ANN. § 311.021. Accordingly, if the record shows that the management team took steps to direct,

19

approve, or disapprove board action, the board of trustees' actions thereafter cannot undermine the management team's will.

Under education code section 21.259, the board of trustees had two possible courses of action with respect to the hearing examiner's recommendation—the board of trustees could either adopt the recommendation or reject the recommendation. *See* TEX. EDUC. CODE ANN. § 21.259. The board of trustees must announce a decision with respect to the hearing examiner's recommendation that includes findings of fact and conclusions of law, and the board of trustees may adopt the findings of the hearing examiner. *Id.* § 21.259(a). If the board of trustees disagrees with a finding of fact, it may reject or change that finding only if the finding is not supported by substantial evidence. *Id.* § 21.259(c). The board of trustees may accept, reject, or change any conclusion of law by the hearing examiner. *Id.* § 21.259(b). The board's action must be in writing only if action is taken to reject the recommendation or to reject or change a finding or conclusion. *Id.* § 21.259(d). With this in mind, we turn to the record.

The Commissioner reviewed the record from the hearing of the board of trustees and determined that on two separate occasions the management team acted on the hearing examiner's recommendation, findings of fact, and conclusions of law. The Commissioner found that the management team "disapproved" the board of trustees' vote by overriding the vote. The Commissioner held that by doing so, the management team acted to approve the certified hearing examiner's recommendation to terminate Matthews's employment and to adopt the findings of fact and conclusions of law. This finding is supported by substantial evidence—Black stated at the hearing that "[w]ith the authority that the Texas Education Agency has put on the management team, let us note—note that

20

we intend to, *and we are, overriding that particular decision.*" (emphasis added). Moreover, the board of trustees' president announced, "let the record reflect that the TEA management team is overriding the decision that's just been made by the Board of Trustees of the Wilmer-Hutchins Independent School District."

The Commissioner held that "[w]hile the management team did not state specifically that it accepted or adopted the recommendation of the certified hearing examiner, the act of overriding or disapproving the board's vote in a situation where only one of two things can happen, either adopt or reject the recommendation, left only one result remaining." We agree. Under the statute, the management team's statement disapproving the board of trustees' decision to reject the hearing examiner's recommendation constituted an action to approve the examiner's recommendation and findings.

With respect to the board of trustees' second vote, the Commissioner determined that the management team overrode or disapproved the second vote to accept the recommendation of the certified hearing examiner to terminate Matthews's employment by "moving the matter to affirmative action." The Commissioner pointed to the management team's statements after the second vote failed: "Again, Mr. President, we're going to override that particular vote also and not to require a vote at this time but in—*move to affirmative action.*" The Commissioner concluded that, as a result of this statement, the management team disapproved or overturned the vote against adopting the hearing examiner's recommendation, and this resulted in adoption of the recommendation to terminate Matthews's employment. Again, we hold that the management team's statement disapproving the board of trustees' decision to reject the hearing examiner's recommendation constituted an action to approve the examiner's

21

recommendation. Accordingly, Matthews's first issue is overruled.

## B. "Good Cause" for Termination

Alternatively, by his second issue, Matthews argues that if his contract was effectively terminated, the decision that good cause existed to support the termination was not supported by substantial evidence. We disagree.

A superintendent's term contract may be terminated for "good cause." *See id.* § 21.211. "Good cause" is defined as "the failure to meet the accepted standards of conduct for the profession as generally recognized and applied in similarly situated school districts in this state." *Id.* § 21.156(a).

As detailed above, Goodman and Damm provided substantial testimony outlining WHISD's financial "crisis." Matthews concedes that the district suffered serious financial problems. Rather than contest the existence of the crisis, Matthews attempts to shift blame from himself to his subordinates, arguing that "the mere fact that a subordinate (i.e. the business manager) makes a mistake . . . does not necessarily justify termination." Matthews provides no authority for this proposition. Moreover, Goodman's and Damm's testimony established Matthews's responsibility for the budget and to supervise his subordinates. Furthermore, Matthews admitted that he did, in fact, review and approve the budgets. Goodman and Damm both testified that Matthews was responsible for the financial crisis and did not act responsibly under the circumstances. We find that this is more than a scintilla of evidence that good cause existed to terminate Matthews. *See Miller,* 51 S.W.3d at 680.

Matthews further argues that at the time he was terminated, he was taking steps to

22

assist the district in remedying WHISD's financial problems. He argues that he should have been afforded the right to remediate the problem. Matthews cites no authority, nor can we locate any, for the proposition that a district employee *must* be afforded an opportunity to cure his or her defective performance before the employee can be terminated.[8] Our discretion is limited to reviewing the Commissioner's decision for substantial evidence—having done so, our inquiry is at an end. Accordingly, Matthews's second issue is overruled.

## IV. Conclusion

The Commissioner's decision is supported by substantial evidence, and his conclusions of law were not erroneous. Accordingly, the trial court properly denied Matthews's appeal of the Commissioner's decision. We affirm.

_____
GINA M. BENAVIDES,
Justice

Opinion delivered and filed this
the 28th day of August, 2008.

_____

[8] The Austin Court of Appeals rejected this argument in an unpublished opinion:

> Hoskins finally contends that he should have been afforded remediation. To support this argument, Hoskins cites a published article suggesting that teachers should be given the opportunity for remediation prior to contract termination or nonrenewal. The article posits that school districts should encourage "remediation" as an alternative to termination or nonrenewal when teachers have engaged in "remediable" conduct, by advising these teachers of their deficiencies and allowing them a reasonable opportunity to correct their problems. The article, however, correctly recognizes that there is no statute governing this alternative solution in Texas. This Court is governed by the Education Code and thus is limited to reviewing the Commissioner's decision under the substantial-evidence rule. We have held that there is substantial evidence supporting the finding of good cause to terminate Hoskins's contract. Regardless of the availability or desirability of other remedies, this ends our inquiry.

*Smithville Indep. Sch. Dist. v. Hoskins*, No. 03-98-561-CV, 1999 WL 716665, at *9 (Tex. App.–Austin Sept. 16, 1999, pet. dism'd) (not designated for publication).